IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| PAULA TURNER, | ) | |
| | ) | |
| Plaintiff, | ) | 4:10CV3159 |
| | ) | |
| v. | ) | |
| | ) | |
| AIG DOMESTIC CLAIMS, INC., | ) | MEMORANDUM AND ORDER |
| AMERICAN INTERNATIONAL | ) | |
| SPECIALTY LINES INSURANCE | ) | |
| COMPANY, and SARETSKY, HART, | ) | |
| MICHAELS & GOULD, PC, | ) | |
| | ) | |
| Defendants. | ) | |

Defendant Saretsky, Hart, Michaels & Gould P.C. (the "Saretsky Firm") has moved to disqualify plaintiff's counsel and their respective firms from representation of the plaintiff in this case (filing no. 33). For the reasons set forth below, the motion will be granted.

BACKGROUND

Plaintiff Paula Turner ("Turner") was a named respondent in eleven securities arbitrations ("the Arbitrations") in which Turner and others were accused of committing various acts of securities fraud. Filing No. 1, ¶¶ 20-21. The claimants in the Arbitrations (the "Arbitration Claimants") were represented by Turner's current attorneys, J.L. Spray and David Gaba and their respective law firms, Mattson, Ricketts, Davies, Stewart & Calkins, Compass Law Group, P.L.L.C. and Golbeck Roth Financial Services Lawyers, P.L.L.C. Filing No. 40-1, ¶ 5.

When the Arbitrations were filed, Turner was working for VSR Financial Services ("VSR"), a registered securities broker-dealer. The Arbitration Claimants asserted Turner and other VSR employees solicited and recommended unsuitable investments, resulting in

damages totaling more than $26,000,000. Filing No. 1, ¶ 22. Pursuant to an Errors and Omissions liability insurance policy issued to VSR by defendant American International Specialty Lines Insurance Company ("AISLIC"), the Saretsky Firm was hired to represent VSR employees Rebecca Engle ("Engle") and Turner in the Arbitrations. Filing No. 1, ¶¶ 39 & 114. The policy was a "Defense Within Limits" policy and the coverage limit was subject to, and reduced by, costs of defense. Filing No. 1, ¶ 18. Turner maintained her innocence and disputed the allegations raised in the arbitration actions. Filing No. 35-14, ¶ 8,[1] & Filing No. 39, p. 2.

While representing Turner, attorney Gary M. Saretsky engaged in settlement negotiations with the Arbitration Claimants, who were represented attorneys Spray and Gaba. Filing No. 40-1, ¶ 11. Turner alleges Saretsky was approached with at least three different settlement offers including:

- A letter dated April 29, 2008, offering to settle all claims against VSR, Turner, and Engle in exchange for $2,750,000;

- A letter dated May 13, 2008, offering to settle all claims against Turner in exchange for the policy limits as related to Turner, and a payment equal to one-half of Turner's net worth; and

- An email date June 16, 2008, offering to settle certain claims against Turner associated with one of the Arbitrations in exchange for $1,000.

Filing No. 1, ¶ 54.

The third offer led to the settlement of one of the Arbitrations on behalf of Turner. Filing No. 40-1, ¶16. The first two offers were followed by settlement discussions with

---

[1] To the extent Turner objects to this paragraph of the Saretsky affidavit (filing no. 38) as irrelevant under Fed. R. Evid. 402, the objection is overruled.

Spray and Gaba, but the parties were not able to reach a meeting of the minds. Specifically the parties could not agree on whether the policy limits were $1,000,000 or $3,000,000. <u>See</u> Filing Nos. <u>35-14</u>, ¶¶ 20-22,[2] & <u>40-1</u>, ¶ 17.

The Saretsky Firm withdrew from representing Turner on September 17, 2008, after VSR's policy limits were exhausted. Filing No. <u>35-14</u>, ¶13. Turner either declined, or was financially unable, to have the Saretsky Firm continue to represent her. <u>Id.</u> After the Saretsky Firm withdrew, Turner contacted Saretsky on November 13, 2009. Filing No. <u>35-14</u>, ¶ 18. During the telephone conversation, Turner maintained her innocence and informed Saretsky that she believed Spray was pressuring her to settle and assign any malpractice claim she had to him. Filing No. <u>35-21</u>.[3]

The numerous Arbitrations instituted against Turner were later consolidated into one action and Turner eventually entered a global settlement agreement with the Arbitration Claimants. Filing Nos. <u>40-1</u>, ¶ 6; <u>30-9</u> & <u>39</u>, p. 2. As part of the settlement, Turner signed a "Settlement Agreement, Covenant Not To Sue and Covenant Not To Execute" (the "Settlement Agreement"). Filing No. <u>30-9</u>. The terms of the Settlement Agreement provide that Turner consented to an "[a]ward or judgment in the aggregate amount of Four Million Five Hundred Thousand Dollars"($4,500,000) representing a "compromised amount negotiated between the parties" for the "total claims of Payees for damages against Turner exceed[ing] $25,000,000." Filing No. <u>30-9</u>, ¶¶ 1 & 3. Turner also agreed to "assign to Payees collectively, all rights and claims she has against the [Saretsky Firm] . . ., as well as

---

[2] To the extent Turner objects to the admission of these paragraphs of the Saretsky affidavit (filing no. <u>38</u>) based on Rules 402, 801, and 901, the objection is denied.

[3] To the extent Turner objects to the admission of the transcript of the telephone conversation under Rules 402, 801, and 901 the objection is denied.

any attorney or attorneys associated therewith." Filing No. 30-9, ¶ 2.[4]  She further agreed to "make herself available for factually accurate testimony in the litigation that Payees plan to pursue to collect insurance proceeds under the policies by the Insurance Companies" and to waive "any claim for privilege based upon her attorney/client relationship with the [Saretsky Firm] and to make all of her communications and business records relating to their representation available to [the Arbitration Claimants]."  Filing No. 30-9, ¶ 4. The Settlement Agreement also relieves Turner of paying any expenses of litigation or attorneys' fees "that may be incurred by [the Arbitration Claimants] in pursuing recovery from the Insurance Companies or her former attorneys."  Id.

Turner filed the lawsuit now before the court, asserting the Saretsky Firm committed various acts of legal malpractice in its representation of her including failing to: (1) advise Turner of potential conflicts of interest with respect to Engle; (2) enter a joint defense agreement in connection with their representation of Engle; (3) make reasonable efforts to settle the claims against Turner; (4) advise Turner of settlement offers extended by the claimants in the Arbitrations; and (5) convey Turner's desire to settle or develop a settlement proposal on her behalf.  Filing No. 1.

The Saretsky Firm denies the allegations and affirmatively alleges the lawsuit "is part of an illegal, collusive agreement proposed by Spray/Gaba and part of an impermissible assignment of a legal malpractice claim to Spray/Gaba or their Arbitration clients."  Filing No. 34, p. 7.  The Saretsky Firm alleges Spray, Gaba and their respective firms should be disqualified from this action for public policy reasons and because Spray and Gaba will likely be necessary witnesses at trial.

---

[4] Turner was also required to pay ten dollars ($10) towards the $4,500,000 settlement.  Filing No. 30-9, ¶ 1.

LEGAL ANALYSIS

The matter of attorney disqualification is within the sound discretion of the court. See Jenkins v. State of Missouri, 931 F.2d 470, 484 (8th Cir. 1991). The burden to prove disqualification of opposing counsel is an appropriate remedy rests with the moving party, but "any legitimate doubts . . . must be resolved in favor of disqualification." Gifford v. Target Corp., 723 F. Supp. 2d 1110, 1117 (D. Minn. 2010). However, decisions to disqualify a party's chosen counsel will be met with "particularly strict scrutiny" due to the potential for abuse. Droste v. Julien, 477 F.3d 1030, 1035 (8th Cir. 2007).

When considering motions to disqualify, courts must balance the public policy concerns and the court's responsibility to uphold the integrity of judicial proceedings with a parties' right to select his or her own counsel.

> In determining whether to disqualify counsel, a court balances the interests and motivations of the attorneys, the clients, and the public. Marvin Lumber & Cedar Co. v. Norton Co., 113 F.R.D. 588, 592 (D.Minn.1986); Arnold, 2004 WL 2203410, at *13. Factors to be considered include a court's "duty to maintain public confidence in the legal profession and its duty to insure the integrity of the judicial proceedings." Potash, 1993 WL 543013, at *16 (citing United States v. Agosto, 675 F.2d 965, 969 (8th Cir.1982)). Courts also take into account a party's "interest in a trial free from even the risk that confidential information has been unfairly used against it," Arnold, 2004 WL 2203410, at *5, as well as the "important public right" of a party to select its own counsel, Macheca Transport Co. v. Philadelphia Indemnity Insurance Co., 463 F.3d 827, 833 (8th Cir.2006).

Gifford, 723 F. Supp. 2d at 1117-8. In addition to public policy concerns, courts may also consider relevant rules of professional conduct, although such rules are not controlling. See F.D.I.C. v. U.S. Fire Ins., Co., 50 F.3d 1304, 1314 (5th Cir. 1995); accord Agosto, 675 F.2d

5

at 969 (finding the adopted ethical rules as one of the factors to be considered in supervising the members of its bar).

## A.      Public policy concerns.

In Edens Technologies, LLC v. Kile Goekjian Reed & McNaus, 675 F. Supp. 2d 75 (D.D.C. 2009), the United States District Court for the District of Columbia provided a detailed analysis of the many public policy concerns that exist when an attorney represents a former litigation adversary in a malpractice action.[5]   In Edens, a manufacturer of golf simulation technology for use in video games sought legal counsel from the firm Kile Goekjian Reed & McManus PLLC ("KGRM") regarding whether one of its devices infringed on a patent owned by Golf Tech, LLC.   Edens was told the device would not violate the patent.   Edens marketed the device and was later sued by Golf Tech.   KGRM represented Edens in the infringement action.   Edens lost on summary judgment and replaced KGRM with new counsel before the trial on damages.   Prior to trial, Edens entered a settlement agreement with Golf Tech and consented to judgment in the amount of $734,246.   In the settlement agreement, Golf Tech agreed to accept as "satisfaction in full" the proceeds of a legal malpractice action by Edens against its former counsel, KGRM.   The settlement agreement further provided that although the malpractice action was to be prosecuted in Edens' name, the counsel was to be selected by Golf Tech and Edens was required to cooperate with the suit.

---

[5] Although Edens is not an attorney disqualification case per se, by dismissing the case, but giving the plaintiff leave to hire different counsel, the Edens court's holding had the practical effect of disqualifying plaintiff's original counsel.  Thus, the analysis of the public policy considerations in Edens is instructive.

6

KGRM sought to dismiss the suit, arguing the cause of action was against public policy because of the assignment and the fact that Edens was now represented by its former adversary in litigation.  The court agreed, citing a number of public policy concerns with such an arrangement, including the risk of collusion, concerns regarding the attorneys' required role-reversal, undermining public confidence, and the potential "commercialization of such claims." Edens, 675 F. Supp. 2d 75, 79-82.

With respect to the risk of collusion, the court summarized the problem as follows:

> The most compelling argument against this type of assignment is that '[p]ermitting an assignment of a legal malpractice claim to the adversary in the underlying litigation that gave rise to the legal malpractice claim . . . creates the opportunity and incentive for collusion in stipulating to damages in exchange for an agreement not to execute on the judgment in the underlying litigation." [Gurksi v. Rosenblum and Filan, LLC, 885 A.2d 163, 174 (Conn. 2005)] Because the 'losing' party in the consent judgment will never have to pay, nothing prevents the parties from stipulating to artificially inflated damages that could serve as the basis for unjustly high damages in the 'trial within a trial' phase of the subsequent malpractice action.

Edens, 675 F. Supp. 2d at 79 (emphasis added); see also Salerno v. Auto Owners Ins. Co., case no. 8:04cv1056, 2006 WL 2085467 *5-6 (M.D. Fl. 2006) (noting that assignments of a malpractice claim to a former adversary are against public policy).  The court determined that it need not make a finding of actual collusion; rather, the mere possibility was enough to cause the court serious concern and find the arrangement impermissible. Edens, 675 F. Supp. 2d at 79; see also, Trinity Mortgage Co., Inc. v. Dreyer, case no. 09cv551, 2011 WL 61680 at *4-5 (N.D. Okla. 2011)(citing numerous public policy reasons for disallowing the assignment of a legal malpractice claim to a former litigation adversary); Salerno, 2006 WL 2085467 at *5-6 (finding an assignment of a legal malpractice claim, based on the premise the attorney negligently failed to settle the underlying dispute, to a former adversary was

against public policy; Alcman Services Corp. v. Bullock, 925 F.Supp. 252, 257-58 (D.N.J. 1996); Gurski v. Rosenblum and Filan, LLC, 885 A.2d 163 (Conn. 2005)(dismissing a legal malpractice claim because the claim was assigned to an adversary in the underlying litigation).[6]

Turner's counsel asserts the foregoing cases are not applicable to this action because Turner "participates in and controls the litigation," (filing no. 39, p. 16) and the Settlement Agreement requires her to "pursue [the claims] and provide the arbitration claimants with a portion of any proceeds recovered," (filing no. 39, p. 2). However, the terms of the Settlement Agreement do not comport with Turner's description. The Settlement Agreement expressly provides that Turner assigned the Arbitration Claimants "all rights and claims she has against [the Saretsky Firm] as well as any attorney or attorneys associated therewith." Filing No. 30-9, ¶ 2. This is far different from Turner's characterization that the Settlement Agreement only provides that the Arbitration Claimants will share in the proceeds of any award granted to Turner. Filing No. 39, p. 2; Cf Dong v. Royal Crown Ins. Co., case no. 09cv0035, 2010 WL 4072285 at *20 (D.N.Mar.I. 2010)(finding an assignment of the proceeds of a tort action is different than the assignment of the cause of action because the plaintiff maintains control of the litigation in the former and in the latter gives up all control, thus violating public policy).   Further, Turner is not liable for any expenses incurred by this action and is expressly required to "make herself available for factually accurate testimony in the litigation [Arbitration Claimants] plan to pursue to collect insurance proceeds and to

---

[6]   Although Nebraska has not addressed the assignment of a legal malpractice claim to a former litigation adversary, Nebraska courts strongly disfavor any type of attempted assignment of a legal malpractice claim and find such arrangement impermissible.  See Community First State Bank v. Olsen, 255 Neb. 617, 622-23, 587 N.W.2d 364, 367 (1998).

"waives any claim for privilege based upon her attorney/client relationship."  Filing No. 30-9, ¶ 4.

Turner's assertion that she is "controlling" the litigation is also not supported by the affidavit she submitted in support of her brief, (filing no. 40-2).  Rather, her affidavit merely states she is not sure she "could hire a competent attorney on a contingency fee" and that she desires "to recover [her] losses . . . and believe[s] her best chance to do that is to keep [her] current counsel."   Filing No. 40-2, ¶¶ 12 & 14.   The affidavit does not state Turner is bringing the action independent of her responsibilities under the Settlement Agreement; controls this litigation; or specifically selected Spray and Gaba as her counsel. There is no showing that Turner was free to select the attorneys of her choice, irrespective of the Settlement Agreement terms, and is currently in total control of the litigation.  Turner does not claim the Agreement has been rescinded or that she is somehow operating separate and apart from her obligations under the Agreement.[7]  Indeed, notwithstanding the appearance of her name on the caption of this case, Turner has provided virtually no evidence to refute the claims that she is not in control of this litigation.  Thus, her argument that the issue of the Settlement Agreement is "irrelevant" for the purposes of this motion to disqualify is not convincing.

---

[7]  Turner seems to discount the Settlement Agreement on one hand by arguing she has control of the litigation, which is clearly contrary to the terms of the Settlement Agreement.  Filing No. 39, p. 19.  On the other hand, she clearly affirms the Settlement Agreement by citing her contractual obligation to testify truthfully. Filing No. 39, p. 16. Beyond those brief comments, it is difficult to tell exactly how Turner believes the Settlement Agreement applies to this litigation as she otherwise ignores it's existence or simply argues it is irrelevant.

Despite Turner's arguments to the contrary, the issues currently before this court were addressed by the courts in Edens, Salerno, and the other cases cited above, and the problems identified by those courts are present in this case. For instance, Turner signed over her malpractice action, and any award derived therefrom, to the Arbitration Claimants apparently in exchange for the Arbitration Claimants agreement not to execute on any of Turner's other assets. Filing No. 30-9, ¶ 5. Therefore, Turner had no incentive to contest the amount of her alleged liability to the Arbitration Claimants because she will never have to pay anything to the Arbitration Claimants. See Edens, 675 F. Supp. 2d at 79. This creates serious concern that the Settlement Agreement does not reflect an accurate assessment of the merits, "but was reached in order to increase the damages in this action." Id. at 80.

Of particular concern in this case is the potential for collusion because of the involvement in Spray and Gaba, first as advocates for the Arbitration Claimants and now as advocates for Turner. As in Edens, the court does not need to find that Turner and her attorneys actually colluded in negotiating and entering the Settlement Agreement. However, it is readily apparent that the potential for collusion in this case is high. The Saretsky Firm offered a transcript of a telephone conversation between Turner and two Saretsky Firm attorneys that occurred after the Saretsky Firm withdrew from representation, but prior to Turner's settlement with the Arbitration Claimants. Filing No. 35-21. During that conversation, Turner maintained her innocence and intimated the idea for the assignment and bringing this action against the Saretsky Firm was initially Spray's, and that Turner was opposed to the arrangement. Again, the court need not determine whether this amounts to collusive behavior. However, the transcript of the conversation between Turner and the Saretsky Firm reinforces and illustrate the public policy concerns raised by Spray's and Gaba's representation of Turner in this action, including whether such arrangements open the door for collusive behavior to the point where public confidence in the legal system will undoubtedly be damaged.

10

The court must balance the public confidence concerns against Turner's interest in retaining counsel of her choice.  However, under the facts in this case and the terms of the Settlement Agreement, it is not clear Turner had any reasonable opportunity to decide who would represent her.  At most, she states she is uncertain "that [she] could hire a competent attorney on a contingency basis," that she "desire[s] to recover [her] losses in this case, and [she] believe[s] that [her] best chance to do that is to keep [her] current counsel."  Filing No. 40-2, ¶¶ 12 & 14.  Assuming Turner's claim has some factual merit, the court is confident Turner could find another "competent" attorney who could "get up to speed" on the issues in this case to help her pursue her legal malpractice claims against the Saretsky Firm and the other named defendants.

On balance, based on the facts and arguments presented by the parties, Turner's right to representation of her choice does not outweigh the public policy concerns implicated if Spray and Gaba represent her in this action.  Spray, Gaba and their respective law firms[8] are disqualified from representing Turner in this action.

---

[8] Spray and Gaba argue their respective firms should not be disqualified.  That argument is without merit. The court finds simply replacing Spray and Gaba with other attorneys in their respective firms will do nothing to alleviate the public policy concerns outlined above or remove the taint that would cover these proceedings if Spray and Gaba were allowed to continue to represent Turner. The risk of collusion is not lessened by allowing a disqualified attorney's partner to step into his or her shoes in litigation.  Moreover, as discussed more fully below, Spray and Gaba will likely be necessary witnesses in this action on a number of topics.  The court has serious concerns with allowing Spray and/or Gaba to be examined or cross-examined by one of their respective partners. Such conduct would undoubtedly undermine the public's confidence in the legal system and undermine the credibility of the proceedings.

**B.      Additional concerns under relevant ethical rules**.

Although the public policy concerns outlined above provide sufficient reason to disqualify Spray and Gaba, Spray and Gaba should also be disqualified because they will likely be necessary witnesses at trial.

The District of Nebraska has not adopted any specific set of ethical guidelines. <u>See</u> NEGenR 1.7(b)(2)(A).   However, the court "may consult other codes of professional responsibility or ethics to determine whether a lawyer has engaged in conduct unbecoming of a member of the bar."  NEGenR 1.7(b)(2)(B).  <u>See also</u>, Agosto, 675 F.2d at 969.

Model Rule of Professional Conduct 3.7 and Nebraska Rule of Professional Conduct § 3-503.7 both provide:

> (a)      A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> > (1)      The testimony relates to an uncontested issue;
> > (2)      The testimony relates to the nature and value of legal services rendered in the case;
> > (3)      Disqualification of the lawyer would work substantial hardship on the client.
>
> (b)      A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

The general prohibition on an attorney serving as an advocate at trial is a longstanding ethical rule and exists for a number of reasons as explained by the court in F.D.I.C. v. U.S. Fire Ins. Co.:

(1) the lawyer may be a less effective witness because he is more easily impeachable for interest; (2) opposing counsel may be inhibited in challenging the credibility of a lawyer who also appears as an advocate; (3) lawyer-witness must argue his own credibility; and (4) while the role of a witness is to objectively relate the facts, the role of an advocate is to advance his clients cause.  Another rationale commonly advanced for the rule focuses on the appearance of impropriety that may be created when a lawyer testifies on behalf of his client.

F.D.I.C., 50 F.3d at 1311 (5th Cir. 1995).

However, under certain circumstances an attorney disqualified for the purposes of trial may advocate for his or her client during pretrial activities.

In most jurisdictions, a lawyer who is likely to be a necessary witness may still represent a client in the pretrial stage." DiMartino v. Eighth Jud. Dist. Ct., 119 Nev. 119, 66 P.3d 945, 946 (2003) (citing Culebras Enters. Corp. v. Rivera-Rios, 846 F.2d 94 (1st Cir.1988); United States v. Castellano, 610 F.Supp. 1151, 1167 (S.D.N.Y.1985); ABA Comm. on Ethics and Prof' l Responsibility, Informal Op. 1529 (1989); and State Bar of Mich. Comm. on Prof'l and Jud. Ethics, RI-299 (Dec. 18, 1997)); see also World Youth Day, Inc. v. Famous Artists Merch. Exch., Inc., 866 F.Supp. 1297, 1303 (D.Colo.1994) ("Rule 3.7 applies only to an attorney acting as an advocate at trial. Thus, with the informed consent of the client, a lawyer who is likely to be a necessary witness may accept employment and continue to represent the client in all litigation roles short of trial advocacy." (internal quotations omitted)); Cerillo v. Highley, 797 So.2d 1288, 1289 (Fla.Dist.Ct.App.2001) (concluding trial court erred in disqualifying counsel who would be witness at trial from participating in pretrial depositions); In re Bahn, 13 S.W.3d 865, 873 (Tex.App.2000) ("[A]n attorney who is disqualified from representation at trial can continue to participate in the client's case until trial commences.").

Droste v. Julien, 477 F.3d 1030, 1035 (8th Cir. 2007).  One exception to this general rule "is when 'pretrial activity includes obtaining evidence which, if admitted at trial, would reveal the attorney's dual role.' " Droste, 477 F.3d at 1036 (quoting World Youth Day, 866

13

F. Supp. at 1303).  Stated another way, "[d]isqualification should not be imposed unless the claimed misconduct in some way 'taints' the trial or legal system."  World Youth Day, 866 F. Supp. at 1303 (internal citations omitted).

Turner argues Spray's and Gaba's testimony will not be necessary or material to the issues involved in this action.  However, many of the claims Turner alleges in her Complaint against the Saretsky Firm revolve around the conduct of Saretsky regarding the settlement negotiations with Spray and Gaba.  For instance, Turner alleges Saretsky failed to take reasonable steps to settle the case, failed to communicate her desire to settle the cases, and failed to advise her of settlement offers.  These claims obviously implicate the communications between attorneys at the Saretsky Firm and Spray and Gaba.  Although, the attorneys at the Saretsky Firm would be informed of these decisions, Spray's and Gaba's testimony is certainly material as it provides the complete picture of the events.  For instance, their testimony is necessary to provide context to the dispute over the policy limits, what offers were actually conveyed to the Saretsky Firm, and in what manner, if any, the Saretsky Firm communicated Turner's desire to settle the Arbitration Claims.

Furthermore, Turner makes no mention of the fact the Saretsky Firm asserts as an affirmative defense that the Settlement Agreement and this case are the result of collusion between Spray, Gaba, and Turner.  The Saretsky Firm will undoubtedly require the depositions and testimony of Spray and Gaba to shed light on the strategy and negotiations that ultimately led to Turner entering the Settlement Agreement and assigning her malpractice claim over to the Arbitration Claimants.  In addition, it is difficult to imagine Turner addressing the affirmative defense without offering some sort of evidence from Spray and Gaba regarding the negotiations and execution of the Settlement Agreement.

14

Immediate disqualification is warranted because the pretrial activity will undoubtedly involve obtaining evidence such that Spray's and Gaba's dual roles will be revealed at trial. For instance, if they are allowed to remain involved in the case, Spray and Gaba will undoubtedly be deposed. "Depositions are routinely utilized at trial for impeachment, and to present testimony in lieu of live testimony when the witness is unavailable. The skill of deposing counsel on direct and cross-examination is necessarily woven into the fabric of the trial itself." World Youth Day, Inc., 866 F.Supp. at 1304. Thus, there is no reasonable way to avoid Spray's and Gaba's dual roles from tainting the entire proceedings.

In short, the court has sufficient grounds to disqualify Spray and Gaba for both public policy and ethics reasons. The combination of the serious public policy concerns outlined above and the fact Spray and Gaba will likely be necessary witnesses on a number of topics, warrants disqualification of Spray, Gaba and their respective firms from plaintiff's representation in this action.

IT IS ORDERED:

1) Plaintiff's objection to the evidence cited herein and offered by Defendants in support of their motion to disqualify (filing no. 38) is denied as set forth in this Memorandum & Order. To the extent this Memorandum & Order does not specifically address or rely on the evidence submitted by Defendants, the objection is denied as moot.

2) Defendants' motion to disqualify attorneys J.L. Spray, Patricia L. Vannoy, and Randall V. Petersen and David Gaba, as well as their respective firms Mattson, Ricketts Law Firm, Compass Law Group and Golbeck Roth Law Firm (filing no. 33) is granted.

3) On or before August 5, 2011, the plaintiff shall either: (a) obtain the services of substitute counsel and have that attorney file an appearance on her behalf; or (b) file a statement notifying the court of her intent to litigate this case

without counsel. Failure to comply with this order may result in dismissal for want of prosecution.

4)     The clerk shall mail a copy of this order to the plaintiff:

> Ms. Paula Turner
> 38780 Hickory Road
> Oakland, Iowa 51560

July 5, 2011                              BY THE COURT:

                                          *s/ Cheryl R. Zwart*_____
                                          United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.